IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALEJANDRO SANTIAGO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. H-04-1103 |
| | § | |
| CITY OF HOUSTON AND | § | |
| OFFICER RICHARD G. | § | |
| PEDERSON, | § | |
| | § | |
| Defendants. | § | |

ORDER

Pending before the Court is the Motion for Summary Judgment (Instrument No. 14) filed by Defendants City of Houston and Officer Richard G. Pederson.  Having considered the motion, submissions, and applicable law, the Court determines the motion should be granted.

BACKGROUND

On March 23, 2004, Plaintiff Alejandro Santiago ("Santiago") filed a complaint against the City of Houston ("City") and Officer Richard G. Pederson ("Pederson"), asserting various federal civil rights and state tort law violations.  Santiago's allegations arise out of a shooting incident that occurred in the early morning hours on July 20, 2003 at the Casa Real Apartment complex.  Santiago resided in a two bedroom apartment with his two siblings, their spouses and children on the second floor of the

complex.  Santiago slept in the living room while his siblings each occupied a bedroom with their respective family members.[1]  Earlier, Santiago's brother, Javier Martinez ("Martinez"),[2] allowed one of his co-workers, Pete Flores Cervantes ("Flores Cervantes"), to store a bag of clothing and personal items in Martinez's bedroom. Santiago was at work at the time and was unaware of this arrangement between Martinez and Flores Cervantes.

Around 11:00 p.m., Carmelo Bautista ("Bautista"), Santiago's brother-in-law, picked Santiago up from work.  The pair stopped on the way home and purchased beer at a convenience store.  After arriving at the apartment, Bautista and Santiago each drank a beer in the living room while watching television.  Bautista went to bed in his bedroom with his family, and Santiago continued watching television and drinking beer on the couch.

At this point, the parties dispute the facts of the case.  After midnight, Flores Cervantes alleges he returned to the apartment to collect his bag of clothing and personal items.  Flores Cervantes contends a man answered the door, but would not let

---

[1]Santiago's sister, Martha Olarte, is married to Carmelo Bautista, and they have two children.  Santiago's brother, Javier Martinez Garcia, is married to Maria De Losangeles, and they also have two children.

[2]The police report lists Santiago's brother as both "Javier Gar[ci]a" and "Javier Martinez Garcia."

him retrieve his belongings.  Flores Cervantes alleges the man pointed a small chrome pistol at him and chased him away from the apartment.  Flores Cervantes reported this conduct to Harris County Constable Deputy D. Griffin ("Griffin"), who was working an extra job as security at the complex.  Griffin notified the Houston Police Department ("HPD") of the disturbance.  Several HPD officers responded to the apartment complex.[3]

After the officers' arrival, Flores Cervantes relayed the same information to Officer Hernandez and described the man who pulled the gun.[4]  Flores Cervantes then led the officers to Santiago's apartment.  Griffin, Hernandez, and Topper went upstairs and approached the apartment, standing to the left-hand side of the apartment door while Pederson remained on the ground floor in the courtyard in front of the apartment. Hernandez alleges he knocked and announced the officers' presence.

After knocking, Hernandez alleges he observed movement on the apartment's front window blinds and heard someone answer from inside.  Hernandez alleges he saw

---

[3]Officer C. Hernandez ("Hernandez") was dispatched to a weapons disturbance call at the Casa Real Apartment complex.  Officer Pederson and trainee Officer C. Topper ("Topper") advised dispatch that they would check by the location. Sergeant Red arrived and was located in the apartment parking lot during the incident.

[4]Pederson alleges he was listening to Flores Cervantes's report to Hernandez.

a hand stick through the window blinds with what appeared to be a small silver pistol.[5]
Pederson and Griffin yelled that a gun was present.  Hernandez advised the individual
to drop the gun and come out with his hands up, which was confirmed by Griffin and
Pederson.  The hand again disappeared behind the blinds, but then emerged with the
gun pointing at the officers on the balcony.[6]  The three officers on the upstairs
apartment balcony attempted to take cover.  Upon seeing the gun pointed at the officers
on the balcony, Pederson drew his weapon and shot at the apartment's front window
eight times.[7]  Santiago was hit once by a bullet in the chest and was severely injured.[8]

        In contrast to the officers' rendition of the events, Santiago alleges the police did
not inform him of their presence.  He also contends he never had a weapon and was
shot for no reason at all.

        After the shooting, HPD officers ordered the residents out of the apartment.

_____

        [5]According to the police report, Griffin saw a small caliber dark colored pistol.
Topper saw something come through the blinds, but did not know what it was.  Pederson
stated he saw a small blue steel automatic pistol.

        [6]Pederson alleges he observed the gun pointed at the officers because he had his
flashlight illuminating the window.

        [7]Seven bullets struck the window.  One bullet hit the bottom portion of the balcony.

        [8]Santiago's condition was initially listed as "critical" and "poor."  He underwent
multiple surgeries.  Santiago alleges he suffered injuries to his chest, abdomen, spleen, liver,
stomach, diaphragm, pancreas, and lungs.  In late August 2003, Santiago's condition was still
listed as "serious."  Santiago was eventually discharged from the hospital on November 19,
2003, almost four months after the incident.

Officers, as well as a canine unit, conducted a consensual search of the apartment, but no weapon was found.  Santiago was charged with "deadly conduct" based on the allegation that he pointed a gun at Flores Cervantes.[9]

<u>STANDARD OF REVIEW</u>

Summary judgment is proper when "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The court must view the evidence and all justifiable inferences in a light most favorable to the non-movant.  *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).  The court should not sit as a factfinder and weigh evidence or evaluate credibility. *Morris v. Covan Worldwide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

Initially, the movant bears the burden of presenting the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact.[10]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-movant to come "forward with 'specific

_____

[9]These charges were later dismissed on February 13, 2004.

[10]A fact is "material" if its resolution is outcome determinative.  *Ginsberg 1985 Real Estate P'ship v. Cadle Co.*, 39 F.3d 528, 531 (5th Cir. 1994).  "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted).

facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting FED. R. CIV. P. 56(e)).

The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conclusory allegations unsupported by specific facts will not prevent an award of summary judgment; the plaintiff cannot rest on his allegations to get to a jury without any significant probative evidence tending to support the complaint. *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 713 (5th Cir. 1994). Thus, the non-movant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998). It is not the function of the court to search the record on the non-movant's behalf for evidence which may raise a fact issue. *Topalian v. Ehrman*, 954 F.2d 1125, 1137 n.30 (5th Cir. 1992).

## LAW AND ANALYSIS

I.    Liability Under 42 U.S.C. § 1983

A.    *Officer Pederson*

In the instant case, Santiago alleges Pederson used objectively unreasonable and grossly excessive force against him. Santiago also alleges Pederson falsely arrested

him and maliciously pressed "trumped up" charges against him.[11]  In response, Officer
Pederson asserts the defense of qualified immunity.  Pederson contends he used his
own discretion in firing his weapon and was performing nonministerial acts within the
boundaries of his official capacity.  Pederson states he believed a weapon was present
based on Flores Cervantes's earlier account and the visual of a gun in the apartment
window.  Pederson, as well as two other officers, alerted to the presence of a gun in the
window.  Pederson contends his actions were reasonable in light of the threat the
officers were faced with, and he discharged his gun based on that perceived threat.
Therefore, Pederson argues he is entitled to qualified immunity.

When sued for a constitutional violation under 42 U.S.C. § 1983, state officials
may assert the affirmative defense of qualified immunity.[12]  *Porter v. Ascension Parish
Sch. Bd.*, 393 F.3d 608, 612 (5th Cir. 2004); *White v. Taylor*, 959 F.2d 539, 544 (5th
Cir. 1992).  "Qualified immunity protects government officials performing discretionary
functions from [civil] liability as long as their conduct does not violate 'clearly

---

[11]To the extent Santiago claims malicious prosecution, this claim does not amount to
a constitutional violation and cannot be supported in a § 1983 action.  *Flores v. City of
Palacios*, 381 F.3d 391, 404 (5th Cir. 2004).  Therefore, summary judgment is appropriate
on this issue.

[12]Cities, however, are not eligible for the defense.  *See Kinney v. Weaver*, 367 F.3d
337, 383-84 (5th Cir. 2004) (implying that qualified immunity is only available for public
officials and not municipalities).

established statutory or constitutional rights of which a reasonable person would have known.'" *Gentry v. Lowndes County, Miss.*, 337 F.3d 481, 484 (5th Cir. 2003); *see also Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994). The defense of qualified immunity provides ample room for mistaken judgments on the government actor's part and protects "all but the plainly incompetent or those who knowingly violate the law." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The qualified immunity analysis is a two-step process: (1) a court must determine whether the plaintiff has alleged the violation of a constitutional right and (2) if the plaintiff alleged a constitutional violation, the court must decide if the conduct was objectively reasonable in light of clearly established law at the time that the challenged conduct occurred. *Tarver v. City of Edna*, No. 04-40734, 2005 WL 1229357, at *3 (5th Cir. May 25, 2005); *Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001).

When determining whether an officer is entitled to qualified immunity, the court must determine whether the facts, taken in the light most favorable to the plaintiff, show that the officer violated a constitutional right. *Porter*, 393 F.3d at 613 n.10 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If a constitutional right was violated, a

determination of whether the right violated was "clearly established" must be made.[13]
*Id*. at 614. "If officers of reasonable competence could disagree as to whether the
plaintiff's rights were violated, the officer's qualified immunity remains intact."
*Tarver*, 2005 WL 1229357, at *3 (citing *Malley v. Briggs*, 475 U.S. 335, 241 (1986)).

1.   Unlawful or False Arrest

Santiago alleges he was unlawfully or falsely arrested in violation of his Fourth
Amendment rights.  In order to make a valid arrest, officers need to have probable
cause. *Tarver*, 2005 WL 1229357, at *3 (citing U.S. CONST. amend. IV).  "Probable
cause exists 'when the totality of the facts and circumstances within a police officer's
knowledge at the moment of arrest are sufficient for a reasonable person to conclude
that the suspect had committed or was committing an offense.'"  *Haggerty v. Tex. S.
Univ.*, 391 F.3d 653, 655-56 (5th Cir. 2004).  Pederson is entitled to qualified immunity
if a reasonable officer in his position could have believed, based on the totality of the
circumstances, it was likely Santiago had committed or was committing an offense.
*See id*. at 656.  Officers who reasonably, albeit mistakenly, conclude that probable
cause exists are still entitled to qualified immunity.  *Id.*; *see also Hunter v. Bryant*, 502

---

[13]"Clearly established" means that "the contours of the right must be sufficiently clear
that a reasonable [officer] would understand that what he is doing violates that right."
*Delaney v. DeTella*, 256 F.3d 679, 686 (7th Cir. 2001); *see also Porter*, 393 F.3d at 614
(defining "clearly established" as clear to a reasonable official that his conduct was unlawful
in the present situation).

U.S. 224, 227 (1991) (stating same).

Here, the officers arrested Santiago for "deadly conduct" for allegedly pointing a gun at and chasing Flores Cervantes with a gun.[14]  *See* TEX. PEN. CODE ANN. § 22.05 (Vernon 2003).  It is unclear from the record which officer(s) physically arrested Santiago.  However, viewing all the facts and circumstances within Pederson's knowledge, the Court determines he had probable cause to arrest Santiago based on the information provided to him by Flores Cervantes and the events occurring at the apartment window.[15]   Therefore, Santiago's arrest did not violate the Fourth Amendment, and this aspect of his § 1983 claim fails.

2.     Excessive Force

In order to prevail under a § 1983 claim, a plaintiff must first allege that a person acting under the color of state law deprived him of a constitutional right or a right afforded under federal law.  *Paz v. Weir*, 137 F. Supp. 2d 782, 796 (S.D. Tex. 2001); *Wadkins v. Gulf Coast Ctrs., Ltd.*, 77 F. Supp. 2d 794, 797 (S.D. Tex. 1999).  Here,

---

[14]By statute, a person commits "deadly conduct" when (a) "he recklessly engages in conduct that places another in imminent danger of serious bodily injury" or (b) "if he knowingly discharges a firearm at or in the direction of: (1) one or more individuals; or (2) a habitation, or vehicle and is reckless as to whether the habitation, building, or vehicle is occupied."  TEX. PEN. CODE ANN. § 22.05(a)-(b) (Vernon 2003).

[15]Pederson listened to Flores Cervantes inform Officer Hernandez that Santiago chased him away from the apartment with a weapon.  In addition, Pederson, as well as the two other officers, identified to a weapon being displayed in the apartment window.

10

Santiago alleges Pederson used excessive force against him. Claims that a law enforcement officer employed excessive force are analyzed under the Fourth Amendment. *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 487 (5th Cir. 2001) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Thus, Santiago must demonstrate Pederson's use of deadly force amounts to an excessive force claim under the Fourth Amendment. *See Flores*, 381 F.3d at 396; *see also Tennessee v. Garner*, 471 U.S. 1 (1985) (indicating the Fourth Amendment is implicated by the use of excessive force to apprehend a suspect).

To state an excessive force claim, the plaintiff must allege: "(1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable."[16] *United States v. Sipe*, 388 F.3d 471, 480 n.22 (5th Cir. 2004) (quoting *Bazan ex rel. Bazan*, 246 F.3d at 487). If the plaintiff cannot establish all three elements, his excessive force claim fails. *Holland v. City of Houston*, 41 F. Supp. 2d 678, 690 (S.D. Tex. 1999). "Deadly force is a subset of excessive force" and "violates the Fourth Amendment

---

[16]A "significant injury" is no longer required for excessive force claims, but the injury must be more than *de minimis*. *Tarver*, 2005 WL 1229357, *4; *see also Harper v. Harris County*, 21 F.3d 597, 600 (5th Cir. 1994). However, to maintain a cause of action, the plaintiff must show she suffered at least some injury. *Thompson v. City of Galveston*, 979 F. Supp. 504, 509 (S.D. Tex. 1997). It is undisputed that Santiago suffered extensive injuries from the shooting incident.

*unless* 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Bazan ex rel. Bazan*, 246 F.3d at 487-88 (internal citations omitted).

Here, the Court determines Pederson had probable cause to believe Santiago posed a threat of serious physical harm to the three officers on the apartment balcony. A prior report by Flores Cervantes indicated an individual in the apartment had a weapon. In addition, more than one officer alerted to the presence of a weapon in the window pointing at the officers on the balcony. Accordingly, the Court finds Pederson's use of deadly force was not excessive and did not violate the Fourth Amendment. Further, to the extent Santiago claims Pederson was negligent in firing his weapon, negligence is not a constitutional violation and cannot support a § 1983 claim. *See Piotrowski v. City of Houston*, 237 F.3d 567, 579-80 (5th Cir. 2001).

Assuming, however, Santiago adequately stated an excessive force violation of the Fourth Amendment, the Court continues with its analysis. The Fourth Amendment's reasonableness inquiry is an objective one. *Colston v. Barnhart*, 130 F.3d 96, 99 (5th Cir. 1997). Courts should "balance the amount of force used against the need for that force." *Id*.; *see also Flores*, 381 F.3d at 399. With respect to deadly force, "[i]t is objectively unreasonable to use deadly force 'unless it is necessary to prevent [a suspect's] escape and the officer has probable cause to believe that the

suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Id.* (quoting *Garner*, 471 U.S. at 3).  Whether a specific use of force was reasonable must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Peters v. City of Biloxi, Miss.*, 57 F. Supp. 2d 366, 374 (S.D. Miss. 1999); *see also Isom v. Town of Warren*, 360 F.3d 7, 10 (1st Cir. 2004).  The Court pays special attention to the facts and circumstances of the case.  *Gutierrez v. City of San Antonio*, 139 F.3d 441, 447 (5th Cir. 1998). Viewing the totality of circumstances from the standpoint of a reasonable officer on the scene, the court pays particular attention to "whether the suspect pose[d] an immediate threat to the safety of the officers or others." *Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir. 1994); *Holland*, 41 F. Supp. 2d at 690-91.  Other factors may also be analyzed, such as: "the severity of the crime at issue" and whether the individual is "actively resisting arrest or attempting to evade arrest by flight." *Tarver*, 2005 WL 129357, at *6; *Holland*, 41 F. Supp. 2d at 690-91; *see also Isom*, 360 F.3d at 11.  Courts should consider that "officers are often forced to make split second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Colston*, 130 F.3d at 99 (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

When analyzing the defense of qualified immunity in an excessive force case,

"the Court is faced with the unusual circumstance that the standard for stating a claim, the objective reasonableness of the force exerted, coincides in large part with the inquiry for determining qualified immunity, the objective reasonableness of the officers' conduct." *Heitschmidt v. City of Houston*, 161 F.3d 834, 839 (5th Cir. 1998). While credibility determinations between the officers' and Santiago's version of events are inappropriate for summary judgment, the Court may determine, as a matter of law, whether Pederson is entitled to a legal defense of qualified immunity. *See Bazan ex rel. Bazan*, 246 F.3d at 490. While recognizing the above-stated propositions are not easily reconciled, under these facts, the Court determines Officer Pederson's conduct in firing his weapon was objectively reasonable in light of clearly established law.

Here, Santiago has the burden to demonstrate that Officer Pederson's conduct was unreasonable in light of clearly established law. *Bazan ex rel. Bazan*, 246 F.3d at 489-90. A right is "clearly established" if a reasonable official would understand that his conduct violates that right. *Kinney*, 367 F.3d at 349-50. The main focus of "clearly established" is "fair warning" and whether prior precedent gave "reasonable warning" that the offensive conduct violated an individual's constitutional rights. *Id*. at 350.

On July 20, 2003, Santiago had a clearly established constitutional right under the Fourth Amendment to be free from excessive and deadly force during the officers' investigation of Flores Cervantes's report. Santiago alleges he did not confront Flores

Cervantes with a weapon and denies ever possessing a gun. He also denies the officers at the apartment door provided any type of warning. However, Santiago was charged with "deadly conduct" for allegedly pointing a weapon at Flores Cervantes on July 20, 2003.[17] *See* TEX. PEN. CODE ANN. § 22.05 (Vernon 2003). The severity of the crime alleged is a misdemeanor under Texas law.[18] *See id*. There is no allegation that Santiago was actively resisting arrest, and he did not attempt to evade arrest by flight.

In contrast, at the time of the incident, the officers alleged that they believed a weapon was present and endangering their lives. Three of the four officers at the scene alleged they saw a weapon displayed in the apartment window. Specifically, Officer Pederson alleges he fired his gun due to the perceived presence of a weapon and accompanying threat to his fellow officers' safety.

Under Santiago's version of events, it is unclear why Officer Pederson fired his weapon as Santiago alleges he never possessed or pointed a weapon at the officers. Santiago points to discrepancies in the police report showing the officers and Flores

---

[17]Again, a person commits "deadly conduct" when (a) "he recklessly engages in conduct that places another in imminent danger of serious bodily injury" or (b) "if he knowingly discharges a firearm at or in the direction of: (1) one or more individuals; or (2) a habitation, or vehicle and is reckless as to whether the habitation, building, or vehicle is occupied." TEX. PEN. CODE ANN. § 22.05(a)-(b) (Vernon 2003).

[18]An offense under the first part is a Class A misdemeanor while an offense under the second part is a third degree felony. TEX. PEN. CODE ANN. § 22.05(e) (Vernon 2003).

Cervantes provided differing descriptions of the type of weapon identified.  For example, Pederson states he saw a small blue steel automatic pistol while Cervantes and Hernandez state they saw a chrome or silver pistol.  In addition, Griffin states she saw a small caliber dark colored pistol.  Moreover, no weapon was found after a search of the apartment.  Based on these discrepancies, Santiago questions whether Officer Pederson's actions in firing his weapon were reasonable or in good faith.

However, the Court notes, under Flores Cervantes's or the various officer's versions, *some* type of gun was observed.  When Officer Pederson fired, he alleges he believed a gun was threatening his fellow officers.  Aside from his own allegations, Santiago has not brought additional evidence to demonstrate that Officer Pederson's conduct was unreasonable in light of clearly established law.[19]  Even if Officer Pederson used poor or mistaken judgment in firing his weapon, Santiago cannot establish Pederson knowingly or intentionally violated the law.  *See Holland*, 41 F. Supp. 2d at 696 (stating officers can "make a constitutionally reasonable judgment based on a factual misperception").  Given the totality of the circumstances facing the officers, the Court finds it was objectively reasonable for Pederson to use deadly force

--------

[19]Santiago offers the affidavits of his relatives, Carmelo Bautista, Marta Olarte Santiago, Maria De Los Angeles Mujica, and a former HPD officer, R.J. Vargas, in support of his case.  However, the City moved to strike these affidavits as untimely (Instrument No. 24).  Because these individuals were never designated as fact or expert witnesses during discovery, the Court declines to rely on any of the affidavits.

16

because a reasonable officer in his circumstances would have believed the individual with the gun in the window posed a threat of serious bodily harm to the three officers on the balcony.  Because the Court determines Santiago has not established that Officer Pederson's conduct was unreasonable, Officer Pederson is entitled to qualified immunity.

B.    *City of Houston*

Next, Santiago alleges he was subjected to excessive use of force, arrest, and prosecution conducted in bad faith and without probable cause in violation of the rights guaranteed him by the Fourth Amendment to the United States Constitution.  Santiago also alleges the City had the responsibility and duty to promulgate and implement policies and procedures prohibiting the use of unreasonable and unnecessary force against citizens.  He further alleges the City had a duty to institute policies prohibiting arrests, imprisonment, and prosecutions not made in good faith and not based on probable cause.   Santiago contends the City is responsible for hiring, firing, disciplining, training, and supervising officers and should not hire or retain police officers who have a known propensity for police misconduct and the abuse of citizens.

Any person who deprives another of "any rights, privileges, or immunities secured by the Constitution and laws" while acting "under color of any statute, ordinance, regulation, custom, or usage" is subject to liability under 42 U.S.C. § 1983.

17

*See* 42 U.S.C. § 1983 (2000); *Wadkins*, 77 F. Supp. 2d at 797; *Centamore v. City of Houston*, 9 F. Supp. 2d 717, 722 (S.D. Tex. 1997).  Municipalities are considered "persons" under § 1983.  *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004).

To prevail on an excessive force claim, the plaintiff must demonstrate: (1) he suffered an injury; (2) resulting directly and only from the use of force that was clearly excessive to the need; and (3) the force used was objectively unreasonable.  *Tarver*, 2005 WL 1229357, at *4; *Peters*, 57 F. Supp. 2d at 374 (citing *Fontenot v. Cormier*, 56 F.3d 669, 674 (5th Cir. 1995))*; see also Thompson*, 979 F. Supp. at 509.

As stated above, the Court previously determined Pederson's use of deadly force was not excessive as he had probable cause to believe his fellow officers' lives were in jeopardy.  Despite this finding and assuming *arguendo* that Santiago adequately alleged a constitutional violation, to hold the City liable, Santiago must demonstrate that (1) a municipal policy or custom existed; (2) the governmental policy makers actually or constructively knew of its existence; (3) a constitutional violation occurred; and (4) through the municipality's deliberate conduct, the custom or policy was the moving force behind the violation.  *Piotrowski*, 237 F.3d at 578; *Meadowbriar Home for Children, Inc. v. G.B. Gunn*, 81 F.3d 521, 532 (5th Cir. 1996); *Paz*, 137 F. Supp. 2d at 800.

To be a moving force, Santiago must show the alleged deprivation was either

18

intentional or due to deliberate indifference.  *Paz*, 137 F. Supp. 2d at 796.  "The key to recovery against a governmental entity under § 1983 is demonstrating that a deprivation of a constitutional right was inflicted pursuant to an official policy or custom."  *Id*. at 797.  The conduct must be directly attributable to the municipality through some sort of official action or approval.  *Id*.  A governmental entity may be liable for implementing or executing an official policy, ordinance, regulation, decision or an informal, widespread custom or practice that is so common it is perceived as official policy.  *Id*. at 797-98.  If city employee actions are used to establish a custom, the action must have occurred for such a duration or frequency that the course of conduct warrants the attribution of knowledge of such actions to the city.  *Id*. at 798-99.  Isolated, solitary incidents cannot constitute a custom or policy under § 1983.  *Id*. at 799.  Moreover, there must be a causal link between the city policy or custom and the plaintiff's alleged constitutional deprivation.  *Id*.  The plaintiff must also show that the governmental entity was deliberately indifferent to the risk that such a constitutional deprivation would occur.  *Id*. at 800.

For municipalities, there is no vicarious liability for the acts of a city's employees under § 1983.  *Id*.  A municipality may not be held liable simply because its employee commits a tort.  *Centamore*, 9 F. Supp. 2d at 722.  Hence, a city does not incur § 1983 liability under a theory of *respondeat superior*.  *Wadkins*, 77 F. Supp. 2d at 798;

19

*Centamore*, 9 F. Supp. 2d at 722.

Among his litany of claims against the City, Santiago alleges: (1) the City's policies, procedures, practices, and customs permit the use of excessive force by its officers; (2) the City empowered Pederson with unfettered discretion to shoot him and permitted Pederson and its officers to file false charges to justify their wrongful conduct; (3) the City has the responsibility and duty to promulgate and implement policies and procedures prohibiting the use of unreasonable and unnecessary force against citizens as well as prohibiting arrests, imprisonment, and prosecutions not made in good faith and not based on probable cause; (4) the City showed deliberate indifference towards providing adequate training and supervision for its officers regarding the use of force, arrests, and prosecutions; and (5) the City is responsible for hiring, firing, disciplining, training, and supervising officers and should not hire or retain police officers who have a known propensity for police misconduct and the abuse of citizens.  The Court will address each of these issues.

In his first three claims, Santiago alleges the City's policies, procedures, practices, and customs permit the use of excessive force by its officers, which empowered Pederson with unfettered discretion to shoot him, and the City authorized Pederson and its officers to file false charges to justify their wrongful conduct. Santiago also contends the City has the responsibility and duty to promulgate and

implement policies and procedures prohibiting the use of unreasonable and unnecessary force against citizens as well as prohibiting arrests, imprisonment, and prosecutions not made in good faith and not based on probable cause.

The City has policies regarding the use of force. For example, General Order 600-17 states "Employees will limit their physical contact with citizens, suspects, and prisoners . . . to that which is reasonably necessary to protect themselves or others, to effect an arrest, or to bring an incident under control." In addition, the Order states the use of force is authorized "to protect themselves or others, to make arrests, and to maintain custody of those arrested. At all times, employees must use the minimum amount of force needed to accomplish these objectives even if, under the circumstances, the law would allow the use of greater force." General Order 550-20 indicates officers are to refrain from unnecessary physical contact with prisoners. General Order 500-1 proscribes that officers are to use only that amount of force necessary to effect an arrest or protect themselves or others. General Order 500-2 instructs officers to prevent harm from coming to prisoners. The City also has a policy stating officers are not to discharge a firearm "except to protect [self] or another person from imminent death or serious bodily injury."

While the City does not have a policy regarding filing false charges, it does have a policy on filing proper charges and conduct and authority. Charges in cases involving

crimes classified as Class B misdemeanors or higher require approval by the Harris County District Attorney's Office.  General Order 500-07 instructs officers to consult with a district attorney to be sure the proper charge is filed, and the district attorney's office has to agree to file the charge.  Further, General Order 200-08 mandates that employees will not make false, untrue or misleading statements.

Here, Santiago makes conclusory allegations that the City's policies, procedures, practices and customs are deficient or improper, but does not identify any specific policy that is wrong.  Santiago makes no mention of the above stated policies and has not rebutted the City's contention that it requires its officers to follow these policies. Santiago has no evidence that the City condones excessive use of force or any other improper behavior by its officers.  Santiago offers no evidence of a pattern or practice of officers engaging in excessive force and an isolated incident is not enough to establish a pattern or custom. *See Estate of Davis ex rel. McCully*, 406 F.3d at 382-83.  The City is not liable simply because it employs a tortfeasor.  *Centamore*, 9 F. Supp. 2d at 722. The particular identified policy must be the "moving force" behind Santiago's injuries.  Because Santiago failed to specifically identify any policy or present any evidence, other than his own circumstances, of improper behavior, the Court determines Santiago failed to show the City has any constitutionally infirm policies or was the "moving force" behind his injuries.

Next, Santiago contends the City is responsible for hiring and firing and should not hire or retain police officers who have a known propensity for police misconduct and the abuse of citizens.  To show the City was negligent in hiring or retaining Pederson, Santiago must prove the City's hiring procedures were inadequate, the City's policymakers were deliberately indifferent in adopting the hiring policies, and the inadequate hiring policies directly caused Santiago's injuries.  *See Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996). Thus, to show the City was negligent in hiring or retaining Pederson, Santiago must demonstrate the City's decision to hire or retain Pederson reflects deliberate indifference to the risk that a violation of this type would occur or naturally follow.  *Centamore*, 9 F. Supp. 2d at 723.  It is not enough for Santiago to show that it was merely probable that Pederson would commit this type of an act, but that it was highly likely that Pederson would commit the particular injuries suffered by Santiago.  *Id*.

Courts have consistently required plaintiffs to plead "specific facts" and "not merely conclusory allegations" in municipal liability cases under § 1983.  *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992).  Here, Santiago provides no facts to support his allegations that the City's hiring procedures are inadequate or that the City was deliberately indifferent to any facts or circumstances that would have led to Santiago's injuries.  Santiago also provides no specific allegations concerning Officer

23

Pederson or his service record that would indicate a problem or pattern of improper activity.  Thus, Santiago's conclusory allegations are insufficient, and his negligent hiring and negligent retention claims fail.

Santiago further argues the City was deliberately indifferent towards providing adequate training for its officers regarding the use of force, arrests, and prosecutions. Santiago asserts the City is responsible for training its officers to avoid police misconduct and the abuse of citizens.  To show the City was negligent in training its officers, Santiago must prove the City's training procedures were inadequate, the City's policymakers were deliberately indifferent in adopting the training policy, and the inadequate training policy directly caused Santiago's injuries.  *See Baker*, 75 F.3d at 200; *Benavides v. County of Wilson*, 955 F.2d 968, 972 (5th Cir. 1992).

In the instant case, the City contends all of its officers must maintain certification by the Texas Commission on Law Enforcement Officer Standards and Education ("TCLEOSE").  *See Huong v. City of Port Arthur*, 961 F. Supp. 1003, 1007 (E.D. Tex. 1997) (stating "[a]ll that is required for the municipality to prevail in a claim based on inadequate training is compliance with state-mandated training standard[s] for its officers.").  Pederson completed this TCLEOSE training.  It is not sufficient to show this incident could have been avoided had Pederson had more training.  *Id*.  In addition, Santiago has not shown that any lack of training of Pederson was so obvious to the City

or Pederson's supervisors that it would likely result in violations of constitutional rights. *See Benavides*, 955 F.2d at 973. Further, allegations of inadequate training cannot be based on a single incident. *See Wassum v. City of Bellaire*, 861 F.2d 453, 455, (5th Cir. 1988). Because Santiago has not identified any facts or evidence regarding a pattern of deficient training or a specific deficiency, Santiago's negligent training claims fail.

Finally, Santiago alleges the City failed to adequately supervise its officers regarding the use of force, arrests, and prosecutions. Santiago asserts the City is responsible for supervising officers and should not condone police misconduct and the abuse of citizens. To prevail on a claim of improper supervision, Santiago must show: (1) a supervisor failed to supervise an officer; (2) a causal connection between a failure to supervise a subordinate and a violation of the plaintiff's constitutional rights; and (3) such failure to supervise amounted to deliberate indifference. *See Baker*, 75 F.3d at 199. Again, Santiago provides no facts or evidence tending to establish inadequate supervision by the City. He offers no evidence of either a failure to supervise Pederson or any other officer or any causal connection between his injuries and any failure to supervise. Hence, these claims fail as well.

II.  State Law Claims

In his complaint, Santiago alleges the City is liable for Officer Pederson's

negligence while acting in the scope of his employment.  Santiago alleges Pederson's

negligent use of his firearm caused his injuries.

In Texas, cities cannot be held liable for common law claims unless the

legislature has expressly waived governmental immunity.  *See Univ. of Tex. Med.*

*Branch v. York*, 871 S.W.2d 175, 177 (Tex. 1994).  Under the Texas Tort Claims Act,

a governmental entity is only liable for:

> (1)   property damage, personal injury, and death
> proximately caused by the wrongful act or omission
> or the negligence of an employee acting within his
> scope of employment if:
>> (A)   the property damage, personal injury, or death
>> arises from the operation or use of a motor-
>> drive vehicle or motor-driven equipment; and
>> (B)   the employee would be personally liable to the
>> claimant according to Texas law; and
>
> (2)   personal injury and death so caused by a condition or
> use of tangible personal or real property if the
> governmental unit would, were it a private person, be
> liable to the claimant.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.021 (Vernon 2000).

Unless a plaintiff can establish an exception to the Texas Tort Claims Act,

municipalities are generally immune from tort actions.  *See* TEX. CIV. PRAC. & REM.

CODE ANN. § 101.057(2) (Vernon 2000); *Centamore*, 9 F. Supp. 2d at 724.

While certain negligence claims are viable under the Act, the plaintiff must show

a city employee's negligent operation or use of a motor-driven vehicle or any tangible,

26

personal property caused their injuries. *Id*. As a matter of law, property does not cause injury if it does no more than furnish the condition that makes the injury possible. *Dallas County Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 343 (Tex. 1998). Thus, to waive immunity, Santiago must establish that the tangible property is the instrumentality of the harm. *Id*. at 342.

In this case, Santiago also alleges Pederson was negligent in the use of his firearm. However, Santiago cannot artfully plead his way into a state law negligence claim against the City and Pederson. Santiago's complaint indicates Pederson maliciously shot him. Intentional tort claims are barred by the Texas Tort Claims Act. TEX. CIV. PRAC. & REM. CODE ANN. § 101.057 (Vernon 2000); *Kellough v. Bertrand*, 22 F. Supp. 2d 602, 612 (S.D. Tex. 1998). Because the Court surmises that Santiago pleaded facts amounting to an intentional tort, such claims are barred by the Texas Tort Claims Act. *Johnson v. Waters*, 317 F. Supp. 2d 726, 739 (E.D. Tex. 2004) (stating the Texas Supreme Court has found a claim evolving from a police officer's shooting, while couched in negligence, is an intentional tort claim barred by the Act).

For the first time in his response to summary judgment, Santiago also alleges the City is liable for negligent implementation of its policies and that Pederson negligently

carried out HPD's rules during this incident.[20]  The City may be liable for injuries caused when an employee negligently carries out a policy.  *State v. Terrell*, 588 S.W.2d 784, 788 (Tex. 1979).  However, the City is only subject to liability for injuries resulting from the negligence of an officer in complying with one of its policies.  *See id*.

Again, Santiago fails to identify which policy he contends the City negligently implemented and Pederson negligently carried out.  The Court notes the City has policies in place regarding excessive force.  Further, from the record, the Court determines Pederson intentionally shot Santiago in defense of his fellow officers, which comports with the City's policy.  Thus, Santiago cannot contort the facts of this case simply to plead a cause of action under the Texas Tort Claims Act.  Accordingly, the Court finds the City did not negligently implement its excessive force policy or any other related policy, and Pederson's intentional conduct contradicts Santiago's blanket conclusory assertion that Pederson negligently carried out a City policy.  Hence, sovereign immunity has not been waived, and Santiago's state tort law claims fail.

---

[20]In an untimely affidavit by former HPD officer R.J. Vargas, the following actions by the officers are alleged to be negligent acts: (1) Topper should have remained with Pederson; (2) a Spanish speaking officer should have been available; and (3) a maximum of two officers should have been on the apartment balcony.  However, because this affidavit is untimely and R.J. Vargas was never identified as a fact or expert witness, the Court declines to consider this material.

Accordingly, the Court hereby

ORDERS that Defendants' Motion for Summary Judgment (Instrument No. 14) is GRANTED.

SIGNED at Houston, Texas, on this 20th day of July, 2005.

_____

DAVID HITTNER

United States District Judge